ROSS et ux,
*Respondents,*

*v.*

WEBER et ux,
*Appellants.*

(No. 41348, CA A20000)

642 P2d 352

Stuart M. Brown, Eugene, argued the cause for appellants. With him on the brief was Young, Horn, Cass & Scott, Eugene.

James H. Anderson, Eugene, argued the cause for respondents. With him on the brief was Thompson, Mumford, Anderson & Fisher, Eugene.

Before Richardson, Presiding Judge, and Thornton and Van Hoomissen, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

Defendants appeal a trial court decree granting plaintiffs an easement for ingress and egress over defendants' property and enjoining defendants from interfering with or hindering plaintiffs' use and enjoyment of that easement. When defendants purchased the servient estate, the easement was unrecorded. They contend that as bona fide purchasers without notice they took their property free of the easement. The trial court found defendants were not bona fide purchasers and that, at the time defendants purchased the property, the use of the easement by the plaintiffs had been such that any reasonable purchaser, examining the property, would have observed that the easement was being used by the plaintiffs.[1]

The lots involved once had a common owner, Mrs. Gravos. In 1971, plaintiffs and another couple, Mr. and Mrs. Tate, purchased property on contract from Mrs. Gravos. The contract contained a grant of an easement for ingress and egress over the lot retained by Mrs. Gravos and subsequently purchased by defendants. Plaintiffs failed to record the land sale contract until after defendants had purchased their property. The issue is thus whether the circumstances were such that defendants, by using reasonable observation and intelligence, should have had notice of the unrecorded easement at the time of purchase. *Corey v. United Savings Bank,* 52 Or App 263, 269, 628 P2d 739, *rev den* 291 Or 368 (1981). We review de novo on the record but give "substantial weight" to the trial judge's findings. *Silvernale v. Logan,* 252 Or 200, 209, 448 P2d 530 (1968).

The evidence produced at trial, both as to the physical condition of the claimed easement and as to the use of it, was in substantial conflict. Both lots involved are vacation properties in Yachats. Mrs. Gravos, the plaintiffs, the defendants and the Tates all reside permanently in Eugene. When defendants purchased their lot and house in August, 1973, the plaintiffs and the Tates had substantially completed construction of a house on their lot.

---

[1] Plaintiffs' complaint alleged three separate "causes of suit," based on actual notice, constructive notice and easement by necessity. The trial court found for plaintiffs on constructive notice, for defendants on easement by necessity, and made no finding on actual notice.

Heavy construction was complete, and inside work was going on. Plaintiffs testified that delivery of construction materials, and their own personal access, was by way of the easement. The easement was never gravelled or improved and remained grass-covered.

Plaintiffs and the Tates worked on the house only on long weekends and vacations during the summer of 1973, staying on occasion at Mrs. Gravos' (now defendants') house next door. Construction and travel across the easement was therefore only intermittent. The physical marks left on the land by use of the easement were a matter of dispute. Mrs. Tate testified that when the weather was wet, tire marks and ruts were apparent, but they became less visible when the weather was drier. The ground was dry when defendants purchased the property in August, but Mrs. Ross testified that even at that time the tire marks were "obvious." Mr. Weber testified that he mowed the area of the easement after he purchased the lot and did not notice any tire ruts. Mr. Tate testified that "there would have to be" evidence of vehicle travel at the time of the Webers' purchase because the ground was "almost always" damp, that during the winter the easement became so soggy that it was difficult to travel and that once Mr. Ross was "on his axles" when he drove across it. Several neighbors who used the easement to walk to other lots testified that they never noticed any tire marks on the grass. Photographs of the area taken by plaintiffs in August approximately two years after use of the easement ceased show a grassy strip with a dry, brown path running down its length. It is difficult to tell if the path was left by foot or vehicular travel. Photographs of the same area submitted by defendants do not show the brown path. The record does not disclose when defendants' photographs were taken.

The parties also disagree about the use by plaintiffs of the lot on the other side of plaintiffs' property for access. Alternative access to plaintiffs' lot is relevant because, if it was obvious that plaintiffs' lot was landlocked, it would be a factor supporting holding defendants to inquiry notice. Plaintiffs and the Tates bought this additional lot in the spring of 1972 to use as a drain field for a

septic tank.[2] The lot was unimproved and densely vegetated. Defendants claim that plaintiffs used this lot for delivery of construction materials, but did not dispute evidence that a driveway on the new lot was not built until 1976. Mrs. Tate did state that the new lot was used once for a delivery before the driveway was installed.

Defendants purchased their lot from Mrs. Gravos in August, 1973. Defendants were long-time friends of Mrs. Gravos, and since 1952 Mr. Weber had visited the property once every two or three years. In June, 1973, when he was considering buying the property, he visited it and did some repair work on the drain field located under the easement, but otherwise "didn't physically go around and look at everything." The Webers negotiated the sale with Mrs. Gravos' daughter. The first time they used their new house they encountered plaintiffs, who were using electricity from the Gravos house. Mr. Weber told plaintiffs that this arrangement would have to cease.

Whether defendants had actual notice of the grant of the easement to plaintiffs was also a matter of dispute. Defendants testified that they received no indication from Mrs. Gravos of the existence of the easement. Mrs. Gravos in a deposition stated that she never discussed the easements with defendants. Mrs. Ross was allowed to impeach Mrs. Gravos by testifying that Mrs. Gravos called her before the sale and said that her buyer wanted the easement relinquished. Mrs. Ross also testified that when Mrs. Weber first complained of plaintiffs' use of the easement, soon after the Webers' purchase, she "said we couldn't drive there anymore because when they purchased the property, the easement was null and void," words indicating awareness.

Considering the totality of the circumstances, and deferring to the trial court on issues of credibility, we believe that, if defendants had exercised reasonable prudence and done an ordinary investigation of the property, they would have noticed at least the possibility of the existence of the easement. Defendants must have been

---

[2] Plaintiffs and the Tates later traded interests in the two lots, the Tates getting title to the new lot and plaintiffs retaining title to the one involved in this case.

quite familiar with the property after visiting it over a period of 20 years and were well aware that construction was proceeding on the neighboring lot. The houses of plaintiffs and defendants are in such close proximity that a person using reasonable observation should be aware that the only access to plaintiffs' lot, at the time of defendants' purchase, was by way of the easement. Defendants failed to inquire of plaintiffs of access to their lot and failed to make more than a cursory physical examination of the property. The fact that they were purchasing vacation property cannot shield them from the consequences of these failures. There was testimony that defendants may have had actual notice of the easement. A purchaser cannot in effect blind himself to activities on and around the property being purchased and then seek protection in the recording statutes.

Affirmed.